MONTY AGARWAL (SBN 191568)
Email: monty.agarwal@aporter.com
ARNOLD & PORTER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:  (415) 471-3100
Facsimile:   (415) 471-3400

Attorneys for Defendant
KINGFISHER MEDIA LLC

BENJAMIN L. SINGER (SBN 264295)
Email: bsinger@coltsinger.com
COLT / SINGER / BEA LLP
235 Montgomery Street, Suite 907
San Francisco, CA 94104
Telephone: (415) 500-6080
Facsimile: (415) 534-6078

Attorneys for Defendant
PURITAN'S PRIDE, INC.
NBTY, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE TAWNSAURA GROUP, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MAXIMUM HUMAN PERFORMANCE LLC,<br><br>Defendants.<br><hr>and RELATED/COORDINATED MATTERS | Master Case No. SACV 12-07189 SJO (AGRx)<br><br>(related to ALL COORDINATED CASES)<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE '107 AND '471 PATENTS ARE INVALID**<br><br>Hearing Date:  January 13, 2014<br>Hearing Time:  10:00 a.m.<br>Courtroom:  1, 2nd Floor<br>Judge:  Hon. S. James Otero |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES.................................2

I.  INTRODUCTION...........................................................................2

II.  PROCEDURAL HISTORY.............................................................4

III.  ARGUMENT. ..................................................................................5

    A.  Summary Judgment Legal Standard...................................5

    B.  The Asserted Claims Are Invalid On Grounds Of Anticipation. ...5

        1.  Callis Anticipates The Asserted Claims Of The '107 Patent. ..................................................................7

        2.  Callis Anticipates The Asserted Claims Of The '471 Patent. ................................................................10

    C.  Claim 19 Of The '107 Patent And Claim 29 Of The '471 Patent Are Invalid As Obvious. ................................................12

    D.  The Waugh Patents Are Invalid Because They Fail The Enablement/Utility Requirement. ................................................13

        1.  The Waugh Patents Fail To Substantiate The Utility Of The Calcium Salt Of Citrulline. ..........................................15

IV.  CONCLUSION. ..............................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ................................................................10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 ...............................................................................................5

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ..............................................................13

*Atlas Powder Co. v. Ireco Inc.*,
190 F.3d 1342 (Fed. Cir. 1999) ...........................................................6, 7

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................5

*Cross v. Iizuka*,
7532 F.2d 1040 (Fed. Cir. 1985) ..............................................................14

*Genentech, Inc. v. Novo Nordisk A/S*,
108 F.3d 1361 (Fed. Cir 1977) ................................................................14

*In re '318 Patent Infringement Litig.*,
583 F.3d 1317 (Fed. Cir. 2009) ...........................................13, 14, 15, 17

*In re Cortright*,
165 F.3d 1353 (Fed. Cir. 1999) ..............................................................13

*In re Fisher*,
421 F.3d 1365 (Fed. Cir. 2005) ..............................................................13

*Invitrogen Corp. v. Clontech Labs., Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) ..............................................................13

*King Pharmaceutical, Inc. v. Eon Labs, Inc.*,
616 F.3d 1267 .............................................................................................7

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...................................................................................12

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
481 F.3d 1371 (Fed. Cir. 2007) ................................................................7

*Perricone v. Medicis Pharmaceutical Corp.*,
432 F.3d 1368 (Fed. Cir. 2005) ...........................................................6, 7

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
315 F.3d 1335 (Fed. Cir. 2003) ..............................................................13

*Rasmusson v. SmithKline Beecham Corp.*,
  413 F.3d 1318 (Fed. Cir. 2005) ...........................................14, 15, 17

*Schering Corp. v. Geneva Pharmaceuticals*,
  339 F.3d 1373 (Fed. Cir. 2003) .................................................6

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005) .................................................6

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) (en banc) .....................................5

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F. 3d 1316 (Fed. Cir. 2001) ...............................................7


**STATUTES**

35 U.S.C.
  § 101 ...............................................................1, 3, 13, 16
  § 102 ....................................................................1, 5
  § 102(a) .................................................................6, 7
  § 102(b) ................................................................6, 12
  § 103(a) ................................................................1, 12
  § 112 ...............................................................*passim*

Fed. R. C. P.
  56 .......................................................................1
  56(c) ....................................................................5

Loc. Rule
  56 .....................................................................1, 5
  56-1 .....................................................................1
  7-3 ......................................................................2

DEFS.' MOT. FOR SUM. JGMT. THAT THE ASSERTED CLAIMS
OF THE '107 AND '471 PATENTS ARE INVALID                    SACV 12-07189 SJO 9AGRx)

# NOTICE OF MOTION

PLEASE TAKE NOTICE that, on January 13, 2014, at 10:00 a.m., in Courtroom 1, 2nd Floor of the above titled Courthouse, or as soon thereafter as the Court may deem appropriate, Defendants Kingfisher Media LLC; Vital Pharmaceuticals Inc.; American Pharmaceutical & Natural Foods Corp.; Nutraceutical Corp.; Vitacost.com; Infinite labs, LLC; NBTY, Inc.; Puritan's Pride, Inc.; Ultimate Nutrition, Inc.; Irwin Naturals; M.D. Science Lab, LLC; Magnum Nutraceuticals; and Bodybuilding.com, LLC ("Defendants"), will and hereby do move, pursuant to Fed. R. Civ. P. 56 and Local Rule 56, this Honorable Court for an order granting summary judgment that claims of the United States Patent Nos. 5,874,471 (the "'471 patent") and 6,028,107 (the "'107 patent") are invalid.

Defendants bring this motion for summary judgment of invalidity on two separate and independent grounds, both of which are dispositive of this action—(1) that claims 1, 2, 15, 16, 18, and 19 of the '107 patent and claims 1, 2, 20, 21, 26, 27, 28, and 29 of the '471 patent (the "Asserted Claims") are invalid on grounds that each Asserted Claim is not novel as required by 35 U.S.C. § 102; (2) that claim 19 of the '107 patent and claim 29 of the '471 patent are obvious under 35 U.S.C. § 103(a); and (3) that the Waugh patents are invalid in their entirety because they claim a hypothesis instead of an enabled invention in violation of the closely related "utility" requirement of 35 U.S.C. § 101 and the "enablement" requirement of 35 U.S.C. § 112.

Defendants' motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, Defendants' Local Rule 56-1 Statement of Uncontroverted Facts and Conclusions of Law, the Expert Declaration of Malcolm Watford in Support of Defendants' Motion for Summary Judgment, the Declaration of Monty Agarwal in Support of Defendants' Motion for Summary Judgment, the pleadings and papers on file herein, and any additional material and argument presented to the Court at the time of the hearing.

This motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on December 2, 2013.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION.

In this action, the Tawnsaura Group, LLC, ("Tawnsaura" or "Plaintiff") alleges infringement of certain claims[1] of United States Patent Nos. 5,874,471 ("'471 patent") and 6,028,107 ("'107 patent") (collectively, the "Waugh Patents" or "patents-in-suit"). This motion presents multiple independent grounds for disposing of Tawnsaura's claims in their entirety.

Each Asserted Claim is anticipated by a 1991 publication in the journal *Arzneimittel-Forschung* by Callis et al. titled "Activity of Citrulline Malate on Acid-Base Balance and Blood Ammonia and Amino Acid Levels." Although Waugh, the named inventor, passed away before this litigation commenced, the article by Callis, would not surprise him. In April 1997, shortly after filing for one of his patents, Waugh wrote to Biocodex Laboratories in France to inquire about a European product marketed under the name Stimol that contained citrulline malate. SUF ¶ 28. Biocodex responded to Waugh's inquiry, informing him about the Callis publication. SUF ¶ 28. Despite the fact that Callis discloses each element of the Asserted Claims, Waugh did not disclose Callis during the prosecution of his applications. Plaintiff, which acquired the Waugh Patents from Waugh's estate, only brought Callis to the attention of the U.S.P.T.O. more than 15 years later and only after Defendants identified Callis as invalidating prior art. In August 2013, Plaintiff petitioned to have all of the asserted claims of the '107 patent reexamined and revised. SUF ¶ 32. As demonstrated below, Callis anticipates the Asserted Claims of both the '471 and '107 patents and renders them invalid. And, alternatively, claims 19 ('107 patent) and 29 ('471 patent) are invalid as obvious.

---

[1] Claims 1, 2, 15, 16, 18 and 19 of the '107 patent and claims 1, 2, 20, 21, 26, 27, 28, and 29 of the '471 patent (the "Asserted Claims"). Not all of the Asserted Claims are asserted against each and every Defendant.

The Waugh patents are also invalid because they do not demonstrate that the full scope of the claimed invention works. This criticism also likely would not have surprised Waugh. While Waugh was prosecuting his applications, he sought to have an article published about his purported invention. SUF ¶ 29. No journal ever published Waugh's article and a number provided highly critical comments. The journal Metabolism responded that "the manuscript does not add sufficient new information regarding arginine or citrulline compared to what is already in the literature" and that the paper was "replete with inaccurate, irrelevant, misleading and speculative statements, starting with its title." SUF ¶ 30. A second reviewer added that the "study performed is far from being a preliminary study, and no control experiments were performed" such that "one cannot reach any conclusions about the usefulness of citrulline to maintain higher arginine level in plasma." SUF ¶ 30. The Canadian Journal of Cardiology noted that Waugh's report on a single individual does "not constitute sufficient evidence for publication on any effects of any such supplementations." SUF ¶ 31.

Black letter law holds that patent is invalid unless the full claim scope is enabled. Here, the full scope of the methods claimed by the Waugh patents cover (1) ingesting citrulline or the calcium salt of citrulline to (2) elevate arginine levels to within a specified range and, thereby, (3) improve one's health. Although the Waugh patents provide no rational evidence to support Waugh's hypothesis with respect to any form of citrulline, it is undisputed that they are completely devoid of any disclosure showing that ingesting the calcium salt of citrulline will have the claimed utility of improving one's health by raising arginine levels into the claimed range. Without such evidence, Waugh's disclosure, does not substantiate the full scope of the purported inventions' alleged utility and provides the public only a bare hypothesis or guess. A hypothesis is not patentable as a matter of law because it lacks the "utility" required by 35 U.S.C. § 101 and, as a result, cannot be "enabled" under 35 U.S.C. § 112.

## II.     PROCEDURAL HISTORY.

The Tawnsaura Group LLC ("Plaintiff" or "Tawnsaura") was apparently created on June 14, 2012.  (Dkt. 121-3).  The only officer identified on the filing was Scott J. Ferrell, who also represents Tawnsaura in this case.  *Id.*  Tawnsaura acquired the patents in August 2012 from the estate of William Waugh, the late patentee.  The assignments were executed on August 15 and 16, 2012, and were recorded on August 17, 2012.  (Dkt. 121-4 and Dkt. 121-5).

Beginning in the fall of 2012, Tawnsaura filed 89 civil actions alleging infringement of the Waugh patents, which the Court deemed related and coordinated for purposes of case management.  September 25, 2012, Minute Order (Dkt. 12).

On January 8, 2013, the Court issued a Scheduling Order that bifurcated the case with the common issues of invalidity and un-enforceability proceeding first. (Dkt. 92).

On March 18, 2013, defendant Puritan's Pride, Inc., filed a motion for summary judgment that the Waugh patents are invalid because they claim a hypothesis instead of an enabled inventions ("Puritan's Motion").  March 18, 2013, Defendant Puritan's Pride, Inc.'s Notice of Motion & Motion For Summary Judgment That The '107 And '471 Patents Are Invalid For Failure To Satisfy The Statutory Enablement/Utility Requirement (Dkt. 120).

On May, 8, 2013, the Court vacated the hearing on Puritan's Motion and took it under submission indicating that it should be decided after claim construction. May 8, 2013, Minute Order (Dkt. 141).

On August 6, 2013, the Court issued its claim construction order.  Order Construing Claims (Dkt. 177).

Thereafter, the Court denied Puritan's Motion and indicated that it would consider another summary judgment motion on the calcium salt of citrulline non-enablement issue.  September 12, 2013, Minute Order (Dkt. 187).

## III.   ARGUMENT.

### A.   Summary Judgment Legal Standard.

Federal Rule of Civil Procedure 56(c) mandates that summary adjudication "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part . . . 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1). Moreover, "summary judgment under Rule 56 . . . is entirely appropriate[] in a patent [case] as in any other case. . . ." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party meets that burden, Rule 56(e) shifts the burden to the nonmoving party and requires it to "set out specific facts showing a genuine issue for trial" beyond those alleged in its pleading. Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252; 106 S. St. 2505, 2512; 91 L. Ed. 2d 202, 214 (1986). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248 (citation omitted).

### B.   The Asserted Claims Are Invalid On Grounds Of Anticipation.

A patent is invalid if the claimed invention is not novel. *See* 35 U.S.C § 102. A purported invention is not novel if it is "described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent" or

"described in a printed publication in this or a foreign country, more than one year prior to the date of application for patent in the United States."  35 U.S.C § 102(a), (b). "'To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently.'" *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999) (quoting *In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997)).  A prior art reference "may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it."  *Id.* at 1347.

A claim limitation is "inherent" if it is "necessarily present" in the prior art invention.  *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1343 (Fed. Cir. 2005).  "In general, a limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art."  *Schering Corp. v. Geneva Pharmaceuticals*, 339 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 970 (Fed. Cir. 2001)).

"In some cases, the inherent property corresponds to a claimed new benefit or characteristic of an invention otherwise in the prior art. In those cases, the new realization alone does not render the old invention patentable."  *Perricone v. Medicis Pharmaceutical Corp.*, 432 F.3d 1368, 1377 (Fed. Cir. 2005); *see also Atlas Powder Co.*, 190 F.3d at 1347 ("[T]he discovery of a previously unappreciated property of a prior art composition, or of a scientific explanation for the prior art's function, does not render the old composition patentably new to the discoverer."); *Bristol-Myers Squibb Co. v. Ben Venue Labs.,* Inc., 246 F.3d 1368, 1376 (Fed. Cir. 2001) (explaining that newly discovered results of known processes are not patentable because those results are inherent in the known processes).

"Thus, when considering a prior art method, the anticipation doctrine examines the natural and inherent results in that method without regard to the full recognition of those benefits or characteristics within the art field at the time of the prior art

disclosure." *Perricone*, 432 F.3d at 1378; *see also King Pharmaceutical, Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1275-76 (When "the prior art methods in their 'normal and usual operation . . . perform the function which [the patentee] claims in [the at-issue patent], then such [patent] will be considered to have been anticipated by the [prior art].'") (*quoting In re Ackenbach*, 45 F.2d 437, 439 (1930)). "To anticipate, the prior art need only meet the inherently disclosed limitation to the extent the patented method does." *Id.* at 1276 (*citing Hewlett-Packard Co. v. Mustek Systems, Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention.").  "The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to operate.  The doctrine of anticipation by inherency, among other doctrines, enforces that basic principle." *Atlas Powder*, 190 F.3d at 1348.

"Although anticipation is a question of fact, it still may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316, 1327 (Fed. Cir. 2001) (internal citations omitted); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1387 (Fed. Cir. 2007) (affirming summary judgment of invalidity based on anticipation and lack of enablement).

### 1.    Callis Anticipates The Asserted Claims Of The '107 Patent.

Callis, a 1991 printed publication, is prior art under 35 U.S.C. § 102(a) or (b). SUF ¶ 2.  Callis describes: "An experimental evaluation of citrulline malate (Stimol®, CAS 54940-97-5), an antifatigue compound, was undertaken in man and in the animal in order to study the pharmacological activity of the substance at hepatic and renal level."  SUF ¶ 3.  Stimol is a supplement manufactured and marketed by Biocodex Laboratories.  SUF ¶ 4.  Callis discloses all of the limitations of the

Asserted Claims of the '107 patent, as described in the following limitation-by-limitation analysis.

**Independent Claim 1:**  Callis accordingly discloses a method of improving health.  Callis reported that Stimol serves as an "anti fatigue compound," and refers to its use "in the treatment of fatigue states."  SUF ¶ 21-24.  Callis further states that administration of Stimol in solution provides "a protective effect against acidosis and ammonia poisoning" as well as "better recovery after intense anaerobic exercise."  SUF ¶ 21-24.

Callis discloses the oral administration of L-citrulline.  Specifically, Callis *expressly* discloses oral administration of "Citrulline malate 50% solution: 6g and excipients qs [*quantum sufficat,* or a sufficient quantity] per 15 ml ampoule of oral solution."  SUF ¶ 5.  Callis also *inherently* discloses oral administration of L-citrulline.  Defendants' expert Dr. Watford explained that the "citrulline in Stimol would be >99% in the form of free citrulline" because the citrulline malate solution administered in Callis would contain "free" L-citrulline in the form of dissolved citrulline molecules.  SUF ¶ 7.  Plaintiff's expert Dr. Kreider had "no reason to dispute" Dr. Watford, and agreed that (1) "[w]hen Citrulline malate is mixed in water, you certainly will have a large proportion of the citrulline be unbounded and become L-citrulline" and (2) it is clear from this [Callis] paper that they're providing l-citrulline," because the citrulline malate is "broken up into L-citrulline and malic acid as it's mixed and gets to the body."  SUF ¶ 7-8.

The L-citrulline administered in Callis was a precursor substance.  Both Defendants expert Dr. Watford and Plaintiff's expert Dr. Kreider agreed that the L-citrulline administered in Callis was a precursor substance.  SUF ¶ 25.

Callis further discloses the claimed increase in plasma arginine level. Callis sets forth a "Comparison of levels of amino acids in venous blood (μmol/l of plasma) in man after administration of citrulline malate or of placebo, each subject being his (her) own comparison."  SUF ¶ 11, 13-15.  The results disclosed in Callis show that

the administration of the Stimol in solution increased the plasma concentration of arginine from a low or normal fasting concentration to a level which is up to three times an average overnight fasting level of about 90 μmole per liter of plasma.  SUF ¶ 16-19.  Specifically, the placebo subjects in Callis had a mean starting plasma arginine level of 70 ± 5 μmol/L, and those same subjects had, after administration of the Stimol solution, a mean plasma arginine level of 112 ± 7 μmol/L.  SUF ¶ 16-19. This was a "significant increase" of 60% over the plasma arginine level of the placebo subjects, and satisfies the "up to three times an average overnight fasting level of about 90 μmole per liter of plasma" limitation of claim 1.  SUF ¶ 18.

**Dependent Claims 2, 15, 16:**  The subjects in Callis who were given Stimol were in "good health," and undisputedly had "continuing brain or neural activities" and "continuing muscular activities."   SUF ¶ 9.  Callis therefore discloses the additional limitations in dependant claims 2, 15, and 16.

**Dependent Claim 18**:  Callis administered Stimol to humans at the dose of three ampoules in the morning and three in the evening with each ampoule containing 2 grams of Stimol in 15 ml of aqueous solution.  SUF ¶ 12.   Three ampoules twice a day means 12 grams of Stimol solution per day, equivalent to about 6 grams of free L-citrulline, per day.  SUF ¶ 12.  Callis therefore discloses dosages within both the chronic and acute dosage limitations of dependent claim 18.

**Dependent Claim 19:**  Callis administered Stimol as an ampoule, which is a liquid form.  SUF ¶ 5-6.  The administered solution contained L-citrulline and malic acid molecules with more than 99% of the L-citrulline in Stimol present as "free" L-citrulline.  SUF ¶ 7-8.  L-citrulline is the only active ingredient in Stimol because it is the only ingredient that raises blood plasma arginine levels. SUF ¶ 26-27.  Dr. Watford explained that malic acid has no effect on arginine levels.  SUF ¶ __.  Plaintiff's expert Dr. Kreider testified that he did not know whether malic acid had

any effect on arginine levels.  SUF ¶ 27.  Callis therefore discloses the additional limitations in dependent claim 19.[2]

Because Callis discloses all of the limitations of the Asserted Claims of the '107 patent, Callis anticipates and renders each of the claims invalid.  Summary judgment in favor of Defendants is therefore warranted on '107 patent claims.

### 2.   Callis Anticipates The Asserted Claims Of The '471 Patent.

The Asserted Claims of the '471 patent are not substantially different from those asserted under the '107 patent, except for the Court's construction of the term L-citrulline.  *See* Dkt. 177 at 16.  Callis discloses all of the limitations of the Asserted Claims of the '471 patent, including the "L-citrulline" limitation, as demonstrated in the following limitation-by-limitation analysis.

**Independent Claim 1:**  For the same reason as set forth above with respect to claim 1 of the '107 patent, Callis discloses the "improving the health of a subject" limitation of  claim 1 of the '471 patent, *i.e.*, Stimol is an "anti fatigue compound."  SUF ¶ 21-24.

For the same reasons as set forth with respect to the claim 1 of the '107 patent, Callis also discloses that the Stimol solution increases the plasma level of arginine in a subject from a low or normal fasting level to a level which is up to three times an average overnight fasting level, which the '471 patent's specification reports to be 89 ± 26 and 75 ± 24 μM for adult men and women, respectively.  SUF ¶ 19.  Callis discloses a "significant increase" of 60% over the plasma arginine level of the placebo subjects.  SUF ¶ 13-18.

---

[2]  Indeed, Plaintiff has asserted against at least one defendant that "[t]he L-citrulline in Defendant's accused [citrulline malate] products are the products' sole active ingredient."  *See* Agarwal Decl. Ex. K at p. 7.  Plaintiff thus necessarily agrees that malate or malic acid is *not an active ingredient*.  "Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) *(citing White v. Dunbar*, 119 U.S. 47, 51 (1886) (patentee cannot transform claim into "a nose of wax which may be turned and twisted in any direction")).

Callis inherently discloses oral administration of L-citrulline, which the Court construed (for the '471 patent) as "the left-handed form of the amino acid represented by the molecular structure [structure] and formula $C_6H_{13}N_3O_3$, and not citrulline malate." (Dkt. 177 at 16).   Dr. Watford opined that the Stimol solution disclosed and administered in Callis inherently contained >99% free "L-citrulline" with the required molecular structure and formula.  SUF ¶ 7.  Dr. Kreider agreed, conceding that "[w]hen Citrulline malate is mixed in water, you certainly will have a large proportion of the citrulline be unbounded and become L-citrulline."  SUF ¶ 7-8.  The administered solution contained free malate, or malic acid, but the malate is not ionically bonded to the citrulline molecules when dissolved in water.  SUF ¶ 7-8.  The oral administration of Stimol disclosed in Callis thus satisfies the L-citrulline limitation and of the other limitations of claim 1.

**Dependent Claims 2, 20, 21:**  Callis anticipates dependent claims 2, 20, and 21 of the '471 patent for the same reason that it anticipates claims 2, 15 and 16 of the '107 patent.  SUF ¶ 9.

**Dependent Claim 26 and 27:**  Callis anticipates dependent claims 26 and 27 of the '471 patent for the same reason that it anticipates claim 18 of the '107 patent.  SUF ¶ 12.

**Dependent Claim 28:** Callis administered Stimol as an ampoule, which is a liquid form and therefore discloses the additional limitation of dependant claim 28.  SUF ¶ 5-6.

**Dependent Claim 29:**  Callis anticipates dependent claim 29 of the '471 patent for the same reason that it anticipates claim 19 of the '107 patent.  SUF ¶ 26-27.

Because Callis discloses all of the limitations of Asserted Claim of the '471 patent, Callis anticipates and renders each of the claims invalid.[3]  Summary judgment in favor of Defendants is therefore warranted on the '471 patent claims.

---

[3] Dr. Watford's opinion on the disclosure in Callis of each limitation of every Asserted Claim further details, in claim chart form, how the Callis publication

### C.   Claim 19 Of The '107 Patent And Claim 29 Of The '471 Patent Are Also Invalid As Obvious.

Claim 19 of the '107 patent and claim 29 of the '471 patent are also invalid under 35 U.S.C. § 103(a) as obvious. Watford Decl. Ex. A at 45 and 33-34.  A claim is invalid for obviousness if, to one of ordinary skill in the pertinent art, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made."  35 U.S.C. § 103(a); *see also KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406–07 (2007).

Administering free L-citrulline without any other active ingredients would have been obvious to a person of ordinary skill in the art based on the disclosure of the Callis article combined with the disclosures of the Awrich article.  *Id*. at 33.  The Awrich reference is an article titled Hyperdibasicaminoaciduria, hyperammonemia, and growth retardation: Treatment with arginine, lysine, and citrulline, that was published in *The Journal of Pediatrics*, Vol. 97, No. 6 (November) 1975.  SUF ¶ 46. Because Awrich was published more than one year before the earliest filing date of the '471 patent, it is prior art under 35 U.S.C. § 102(b).  SUF ¶46.

Awrich discloses the use of free L-citrulline (without any other substance) to increase the arginine levels in blood plasma.  SUF ¶ 46.  For the '471 and '107 patents, the parties agree that a person of ordinary skill in the art at the time the patents were filed would be an individual with a Ph.D. in biochemistry, physiology, or the like, and at least two years of post-doctoral research or clinical work in physiology or biochemistry, in the areas of intermediary metabolism and nutritional science.   Watford Decl. Ex. A at 18.  A person with this level of skill in the art would have known to substitute free L-citrulline alone for the solution in Callis (which contained free L-citrulline, and also contained malic acid), and would have achieved

anticipates the '107 and '471 patents, and how claim 19 ('107 patent) and 29 ('471 patent) are invalid as obvious.  *See* Watford Decl. Ex. A at 30-33, 43-45.

the invention of claims 19 and 29.  *Id.*  Callis and Awrich are in the same field of endeavor, and their teachings disclose that their solutions achieve the result of increased plasma arginine, and thus persons of skill in the art would have been prompted to utilize solely L-citrulline (as used in Awrich) as a substitute for the solution in Callis.  SUF ¶ 48.  A person of ordinary skill in the art would have had a reasonable expectation that this combination would have succeeded and would have achieved the invention of claims 19 and 29, and the results would have been predictable to a person of ordinary skill in the art.

### D.  The Waugh Patents Are Invalid Because They Fail The Enablement/Utility Requirement.

The claims of the Waugh patents are invalid because they are not enabled. Enablement is a question of law.  *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1070 (Fed. Cir. 2005). The enablement requirement is stated in 35 U.S.C. § 112,[4] and is determined as of the effective filing date of the patent application. *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339 (Fed. Cir. 2003).  "The enablement requirement also ensures that the full extent of the claims asserted by an applicant have utility, such that the public can make and use the invention recited therein."  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1368 (Fed. Cir. 2010).

"Enablement is closely related to the requirement for utility" stated in 35 U.S.C. § 101.[5]  *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1324 (Fed. Cir. 2009).  "It is well established that the enablement requirement of § 112 incorporates the utility requirement of § 101."  *In re Fisher*, 421 F.3d 1365, 1378 (Fed. Cir. 2005).

---

[4] The statute states: "The specification shall contain a written description of the invention, . . . in such full, clear, concise, and exact terms *as to enable any person skilled in the art* to which it pertains, or with which it is most nearly connected, *to make and use the same. . . .*"  35 U.S.C. § 112 (emphases added).

[5] The statute states: "Whoever invents or discovers any new and *useful* process, machine, manufacture, or composition of matter, or any new and *useful* improvement thereof, may obtain a patent. . . ."  35 U.S.C. § 101 (emphases added).

To meet the utility requirement of § 101, a patent specification must teach a person of ordinary skill in the art the "practical" utility of the claimed invention, and that practical utility must be both credible and specific. *In re Cortright*, 165 F.3d 1353, 1356-57 (Fed. Cir. 1999).

"The utility requirement prevents mere ideas from being patented." *'318 Patent Litig.*, 583 F.3d at 1324; *see also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir 1977) ("Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable."). Like an idea, an "unproved hypothesis" does not meet the utility requirement. *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1325 (Fed. Cir. 2005). "Research proposals" are not sufficient either. *'318 Patent Litig.*, 583 F.3d at 1324. Not even a "respectable guess" satisfies the enablement/utility threshold because a "greater measure of proof" than "plausibility" is required. *Rasmusson*, 413 F.3d at 1325. Allowing parties to patent untested hypotheses potentially would "give priority to the wrong party" and "'confer power to block off whole areas of scientific development, without compensating benefit to the public.'" *'318 Patent Litig.*, 583 F.3d at 1324 (*quoting Brenner v. Manson*, 383 U.S. 519, 534 (1966).

For method of treatment patents, like Waugh's, the prohibition against patenting a hypothesis means that, in all but extraordinary circumstances, satisfying the enablement/utility requirement requires presenting experimental results that substantiate the claimed efficacy. *'318 Patent Litig.*, 583 F.3d at 1327. Accordingly, when claiming a method involving pharmacological activity, the person seeking the patent must provide probative evidence that the claimed method is reasonably likely to lead to the proposed useful effects. *Cross v. Iizuka*, 7532 F.2d 1040, 1050 (Fed. Cir. 1985). Unless the utility would have been obvious, if the specification presents "no evidence [] to demonstrate that the claimed [methods] do have [the claimed]

effects," then the patent fails to demonstrate sufficient utility.  *Rasmusson*, 413 F.3d at 1323 (internal citations omitted).

The rule against patenting a hypothesis is a hard-line rule.  The nature and quality of the hypothesis claimed is irrelevant.  A patent claiming a hypothesis is not saved by the fact that the hypothesis was "scientifically grounded" or "worth the effort to check out."  *'318 Patent Litig.*, 583 F.3d at 1327.  It is also irrelevant if the public later found the claimed hypothesis to be particularly useful.  In our patent system, naked hypotheses necessarily are unpatentable because the "spoils" are reserved for the "party who actually showed that the method works."  *Rasmusson*, 413 F.3d at 1325.

### 1.     The Waugh Patents Fail To Substantiate The Utility Of The Calcium Salt Of Citrulline.

Waugh patents are "method of treatment" patents.  The broadest claims in the '471 patent claim methods of improving health by orally administering citrulline or the calcium salt of citrulline to increase arginine levels in the blood (within a defined range).  SUF ¶ 33.  Similarly, as construed by the Court, the broadest claims in the '107 patent claim methods of improving health by orally administering "any form of the amino acid citrulline" to raise arginine into the claimed range.  (Dkt. 177 at 16).  The dependent claims in both patents limit this method to certain patient populations, or require that the citrulline be administered in certain dosages or formulations.  SUF ¶ 1.  Thus, all of the claims in both patents claim the administration of the calcium salt of citrulline and the claimed utility in each case is improved health through increased arginine levels.  SUF ¶ 33.

The Waugh patents, however, provide only a guess or hypothesis that administering the calcium salt of citrulline will have the claimed utility.  The patents are completely devoid of any supporting disclosure about the calcium salt of citrulline.  SUF ¶ 35-45.  The prior work discussed in the Background section does not address the calcium salt of citrulline generally, much less show that administering

1   it will have the claimed utility.  SUF ¶ 35-45.  The examples in the specification do

2   not involve the calcium salt of citrulline and undisputedly do not provide scientific

3   data to suggest that the claimed method is likely to improve health as Waugh

4   hypothesized.  SUF ¶ 35-45.  Taking the specification of the Waugh patents as a

5   whole, the public received nothing but conjecture as to the calcium salt of citrulline,

6   which is part of each and every claim of both of the Waugh patents.

7        Both experts in this matter, Dr. Kreider and Dr. Watford, agree on these points.

8   Dr. Kreider admits that there is no indication in the Waugh patents that anyone ever

9   ingested the calcium salt of citrulline and experienced the claimed utility.  SUF ¶ 35-

10  43.  Dr. Kreider emphasized that the utility of a specific compound can only be

11  substantiated through testing that specific compound.  SUF ¶ 45.  He admitted that

12  the Waugh patents do not disclose any "pilot data" regarding the calcium salt of

13  citrulline and that without pilot data, the claimed utility of administering the calcium

14  salt of citrulline is an unsupported hypothesis.  SUF ¶ 40.  He further declared that a

15  person of ordinary skill in the art at the time Waugh applied for his patents would

16  have known that small changes in formulation can have profound effects on the

17  physiological impact of ingesting a nutrient and, as a result, one would have to test

18  the specific formulation to know anything about it.[6]  SUF ¶ 45-46.  Simply put,

19  Waugh posited that administering the calcium salt of citrulline would elevate arginine

20  levels to within a specified range and thus improve health, but failed to provide any

21  disclosure to substantiate his hypothesis.

22  _____

23  [6] Dr. Kreider also applied the wrong test in opining on enablement.  Dr. Kreider's
    opinion rests on his belief that a person having ordinary skill in the art would have

24  known how to make the invention (a different "prong" of § 112 enablement), and the
    invention—if effective—is useful (a different component of § 101 utility).  Whether a

25  person of ordinary skill in the art at the relevant time could have formulated the
    calcium salt of citrulline and had a subject consume it is irrelevant to the

26  enablement/utility requirement.  Indeed, Dr. Kreider's proposed rule would lead to
    absurd results.  All that would be required to enable a patent on a method of curing

27  cancer by administering cotton candy would be a disclosure that teaches how to make
    and administer cotton candy.  This is plainly not the proper standard.

28

1      The cases that apply the enablement/utility requirement to method of treatment

2 patents like Waugh's provide a clear-cut rule that is case-dispositive here.  That rule

3 states that a patent is invalid if it offers nothing to support the utility of the claimed

4 methods.  The *'318 Patent Litigation* case is controlling on this point.  In that case,

5 the claims were directed to methods for treating dementias such as Alzheimer's

6 disease by dosing with a therapeutically effective amount of galantamine.  *'318*

7 *Patent Litig.*, 583 F.3d at 1320.  The patent specification had referred to and

8 summarized six technical papers suggesting that galantamine was able to cross the

9 blood-brain barrier and have effects within the human brain, and that administration

10 of galantamine in animals had positive effects on memory.  *Id.* at 1321.  But "neither

11 in vitro test results nor animal test results involving the use of galantamine to treat

12 Alzheimer's-like conditions were provided," facts the Federal Circuit seized on in

13 affirming that the claims were invalid for lack of utility/enablement.  *Id.* at 1325.

14      Similarly, in *Rasmusson*, an interference proceeding, the claims at issue were

15 directed to methods of using finasteride as a selective inhibitor in the treatment of

16 prostate cancer.  *Rasmusson*, 413 F.3d at 1323.  The patent application did not,

17 however, provide any data substantiating the efficacy of finasteride in treating

18 prostate cancer.  The applicant instead relied on prior art suggesting various

19 inhibitors, of which finasteride arguably was a species in a broad genus, were

20 effective for the treatment of prostate cancer.  *Id.* at 1324.  The Federal Circuit

21 affirmed the Patent Office's rejection of the claims for lack of utility/enablement on

22 the grounds that the applicant did not supply any data that a selective inhibitor such

23 as finasteride would be effective to treat prostate cancer.  *Id.* at 1325.  Although the

24 procedural posture of *Rasmusson* was different, its holding on the utility/enablement

25 requirements remains controlling.

26      Thus, as a matter of law, a method of treatment patent must provide at least

27 *some* relevant scientific evidence that the allegedly novel technique will work for its

28 intended purpose. Without the requirement of scientific proof and enabling

disclosure, the enablement and utility requirements would be meaningless, and the important public benefit that these requirements provide could be readily defeated. The Waugh patents do not meet the burden required and they should be adjudged invalid.

**IV.   CONCLUSION.**

For the reasons set forth above, Defendants' Motion for Summary Judgment should be granted.

Date:  December 3, 2013             Respectfully submitted,

By:   /s/ Monty Agarwal
        Monty Agarwal
        ARNOLD & PORTER LLP
        10th Floor
        Three Embarcadero Center
        San Francisco, CA 94111-3711
        Telephone: +1 415.471.3100
        Facsimile: +1 415 471.3400
        Email: monty.agarwal@aporter.com

        Attorneys for Defendant
        KINGFISHER MEDIA LLC

By:   /s/ Benjamin L. Singer
        BENJAMIN L. SINGER
        COLT / SINGER / BEA LLP
        235 Montgomery Street, Suite 907
        San Francisco, CA 94104
        Telephone: (415) 500-6080
        Facsimile: (415) 534-6078
        Email: bsinger@coltsinger.com

        Attorneys for Defendant
        PURITAN'S PRIDE, INC.
        NBTY, INC.